**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITES STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Case No. 3:05-CR- 0139-L** |
| | § | |
| **EDWARD EUGENE CADE** | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Edward Eugene Cade's Motion to Suppress, filed October 6, 2005. An evidentiary hearing, including argument, was held on February 16, 2006. After careful consideration of the motion, response, evidence and applicable law, the court **denies** the Motion to Suppress.

## I.      Background

On May 10, 2005, Dallas Police Sergeant Gerald Smalley ("Smalley") received information regarding persons possibly unloading drugs from a U-Haul truck parked at 1557 Trailridge Drive, Dallas, Texas. Smalley relayed this information to Dallas Police Officer Christopher Wagner ("Wagner"). Wagner and Dallas Police Officer Joshua Sanderlin ("Sanderlin") drove to the location. Wagner testified that they arrived shortly after 10:40 a.m., and observed a U-Haul truck backed up to an open gate at the house. They saw two men, later identified as Edward Eugene Cade ("Cade") and LaDarryl Kelly ("Kelly"), standing in the driveway in front of the open garage. Sanderlin testified that, as the officers approached, one of the men, he could not recall whom, closed the garage door.

Sanderlin told Cade that the officers were there because of a complaint about Cade's dogs, which were in the backyard. He told Cade that an animal control officer was on his way to inspect

the dogs.  Sanderlin testified that within five to ten minutes of the officers' arrival, Cade went into the house.  He stated that Cade had to unlock burglar bars and the back door to enter the home.  He testified that Cade relocked the burglar bars before entering the house.  Sanderlin stated that, after approximately five minutes, Cade came out of the house with a big trash bag, which he set beside the house, and relocked the burglar bars.  According to Sanderlin, after a few minutes of conversation, Cade went back into the house.

While Cade was inside the house, Sanderlin spoke with Kelly.  At first Kelly identified himself with another name.  Upon determining that Kelly had provided them a false identity, the officers detained him until he could be identified.  It was later determined that there was a warrant for Kelly's arrest out of Denton County, Texas, and he was arrested.

According to Sanderlin and Wagner, after approximately 10 to 15 minutes, Cade came out of the front of the house carrying two black trash bags that he placed in the bed of a truck parked in front of the house.  Both officers testified that Cade was sweating profusely.  They also testified that Cade was moving about freely and using his cell telephone.

According to Cade, the officers arrived between 8:30 and 9:45 a.m.  He testified that the gate was closed.  He stated that after the officers arrived, he went into the house to get the remote control to open the gate and allowed the officers to enter the backyard.  He testified that he only entered the house one time, which was to retrieve the remote control, and that after he returned from inside the house, the officers made him and Kelly sit on the curb near a parked police car.  He stated that he was allowed to use his cell telephone, and that he called his mother, Wanda Cade, because he believed that the officers intended to arrest him.  According to Cade,  he was not free to move about. He testified that when he requested to go to the bathroom, the officers would not let him enter the

house, but instructed him to go by a tree near the house, and he did.  He also testified that he was allowed to speak with his mother, but she had to stay on the opposite side of the driveway from where he was sitting.

Sometime after the initial encounter between the officers and Cade, Smalley arrived at the location and told Cade that the officers were there to investigate a complaint of drug activity.  He asked Cade if the officers could search the house.  Smalley testified that he told Cade he could refuse consent and that the police were not interested in small amounts of drugs.  He also told Cade that he could conduct the walk-through with the officers and control which areas would be searched.  The officers testified that Cade was uncertain of whether to consent to the search.  Smalley stated that Cade discussed the matter with his mother.  Sanderlin testified that Cade could not make up his mind regarding whether to consent to the search, and made several telephone calls after his discussion with Smalley.  Wagner stated that, as a result of Cade's indecisiveness, he returned to the police car because he assumed that Cade would not consent to the search.

Cade testified that he repeatedly refused to give his consent for the search, but consented after the officers told him that if they had to get a search warrant they would cause damage to the house.  Cade maintained that he believed he was detained and that he could not leave.  He stated that he felt pressured into giving consent to search his house.  Cade also testified that while he was sitting on the curb, there were police officers standing over him.  He stated that there was some discussion among him, Kelly and the officers about a taser, and one of the officers told him if he ran they would use a taser.  He stated that he was never threatened with a taser or any other weapon to give consent to search or walk-through his house.

Mrs. Cade testified that she arrived at Cade's house some time between 9:00 a.m. and 10:00 a.m. in response to his call regarding the police being there.  She stated that when she arrived, there were a lot of police officers present.  According to Mrs. Cade, Cade was already sitting on the curb near the front of the house.  She testified that she was allowed at one point to sit down by Cade and talk with him.  She advised Cade not to consent to the search.  She stated that the officers would not allow Cade to go into the house to use the bathroom, or allow her to take him to get something to eat.

According to Smalley, Cade consented to the search after approximately 10 to 15 minutes of discussion.  Cade testified that he gave consent so the officers would not "tear up" his house.  According to the officers, Cade was never detained or coerced into giving consent to search his house.

Wagner, Sanderlin, Cade and Mrs. Cade went into the house through the back door.  Wagner testified that this occurred at approximately 11:25 a.m.  Both officers testified that, as they walked through the house, they observed four industrial size boxes of baking soda in the laundry room.  Sanderlin also testified that he observed  a couple of boxes of ziplock bags and some heat-seal bags.  He stated that, based on his experience as a police officer, baking soda is used to cook crack cocaine, and heat-seal bags are used to package marijuana.

The officers testified that Cade led them through the house and told them where they could and could not search.  Wagner and Sanderlin stated that it was basically a walk-through.  Cade testified that the officers never touched anything.  Cade told the officers that he had a shotgun that he kept in his bedroom closet.  Wagner confirmed that the shotgun was in the closet, but left it there.  According to the officers, Cade told them that he had a little bag of marijuana in a cabinet in the

bedroom. They stated that when Cade opened the cabinet it was empty except for some small flakes of marijuana on one of the shelves. They also stated that the strong smell of marijuana indicated that there had been a large quantity of marijuana in the cabinet recently. While they were inside the house, Mrs. Cade attempted to contact Cade's attorney on the house telephone. The officers indicated that the search was over and everyone exited the house. The officers ordered Cade to sit on the curb.

The officers then arrested Cade for felon in possession of a firearm, as he was on parole for a drug-related offense. At some point after his arrest, Cade was handcuffed and placed in a police car. The officers also determined that probable cause existed for a search warrant based on what they observed and smelled in the house. They secured the house, and no one was allowed to enter it. Smalley testified that he asked Cade to sign a voluntary consent form to allow the officers to conduct a more thorough search of the house and to save the time of obtaining a search warrant. He stated that Cade discussed this option with his mother and was allowed to use his cell telephone to call his attorney. Cade refused to sign the search consent form.

The officers requested a search warrant, and it took approximately two and one-half to three hours before the search warrant arrived. A search was conducted of the house. The officers recovered approximately 5,981.5 net grams of cocaine, which included approximately 493.8 net grams of cocaine base (crack cocaine), and approximately 1,244.9 net grams of marijuana. A Smith and Wesson .40 caliber semiautomatic handgun, a Glock 23 .40 caliber semiautomatic handgun, and live rounds were also found. The shotgun Cade previously showed the officers was seized along with some live shotgun rounds. Various other items were seized, including drug packaging items, a money-counting machine, and drug ledgers. Most of the narcotics, except the marijuana residue

in the dresser drawer, were found in the attic.  Sanderlin testified that he did not search the trash bags in the truck, but was told by other police personnel that they contained wrappings for cocaine and marijuana.

Cade was given his *Miranda* warnings.  He signed a document stating that he knowingly and voluntarily agreed to waive his rights.  He admitted at the hearing that an officer told him that any statements that he made could be used against him.  In the statement, Cade admitted that the cocaine and crack cocaine were his.  He said he purchased the cocaine the previous week.  Cade testified that the officer read the statement to him, and that he agreed to everything in the statement because he was afraid.  He stated that the officer told him he had to make a statement or he would receive a life sentence.  He admitted that everything in the statement was true, except for the time the officers arrived at his house.   He testified that the statement that the officers arrived at 11:00 a.m. is incorrect, and that the officers arrived earlier than 11:00 a.m.

Cade was charged with possession with intent to distribute 6 kilograms or more of cocaine, approximately 500 grams or more of cocaine base and approximately 1200 grams of marijuana. He was also charged with possession of a firearm (a shotgun) during a drug trafficking crime.

## II.      Defendant's Motion to Suppress

Cade contends that the police officers approached him at his residence, detained him, and made a warrantless search of his residence.  After the initial search, a warrant was obtained and the officers conducted a subsequent search. Cade maintains that any evidence seized was the result of an unlawful detention by the police officers, and any statements he made after the initial detention are "fruits of the poisonous tree."  Def.'s Motion at 2.

Cade points out that when the officers initially approached him, they did not have a search warrant. He contends that there was no exception to the warrant requirement to justify his detention. He further asserts that the officers did not have probable cause or reasonable suspicion to approach and detain him. He contends that the seizure and detention were unlawful, and violated the Fourth and Fourteenth Amendments to the United States Constitution.

Regarding the search of his residence and his consent to search, Cade alleges that "any consent, if there was consent, was obtained as a result of an unlawful detention and coercion on the part of the [o]fficers and that any alleged consent was not voluntary." *Id.* Cade thus maintains that any evidence gained from the entry is "fruit from the poisonous tree." *Id.*

Cade further asserts that the search warrant was unlawfully obtained. Specifically, he maintains that the evidence gained to form the basis for the search warrant was the result of an earlier unlawful detention and coerced consent. He also contends that there is a question of fact as to the officers' allegation that there was an odor of marijuana inside his residence. He asserts that the officers' claims in the Affidavit for Search Warrant are not credible and did not rise to the level of probable cause, thereby rendering the search warrant invalid.

## III.   Government's Response

The Government contends that the officers' initial approach of Cade was a lawful "knock and talk" and did not constitute a seizure. It maintains that Cade was not in police custody or being detained, and that he could have refused to speak with the officers and walked away. The Government asserts that Cade voluntarily spoke with the officers, and provided information about his use of marijuana in the house. The Government also contends that Cade consented to the first search of the house, that at the time of his consent he was not in custody, and that he was not

handcuffed or detained.  It maintains that the officers used no threats or coercive tactics.  It avers that Cade's voluntary written statement, given after he was *"Mirandized*," is not the "fruit" of an illegal search and is admissible against him at trial.

**IV.    Analysis**

       **A.    Knock and Talk and Voluntary Consent to Search**

              **1.    "Knock and Talk"**

Warrantless searches and seizures inside a person's home are presumptively unreasonable under the Fourth Amendment;[1] however, this presumption of unreasonableness may be rebutted where the occupant gives valid consent to conduct the search or exigent circumstances exist to justify the intrusion.  *See Steagald v. United States*, 451 U.S. 204, 211 (1981); *United States v. Richard,* 994 F.2d 244, 247 (5th Cir. 1993).  Courts have recognized the "knock and talk" strategy, a noncustodial procedure whereby an officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence, as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity.  *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) (citation omitted); *see also United States v. Zertuche-Tobias*, 953 F. Supp. 803, 829 (S.D. Tex. 1996) (citations omitted).

---

[1]The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

**Memorandum Opinion and Order – Page 8**

The initial issue before the court is whether the police officers used the "knock and talk" strategy as a pretext to illegally gain consent to search Cade's house.  The evidence establishes that the police went to Cade's house in response to information regarding persons possibly unloading drugs from a U-Haul truck.  As part of their crime-fighting responsibilities, the officers had a duty to investigate this information.  The officers first told Cade they were investigating a complaint regarding his dogs.  Cade testified that he opened the gate for the officers to enter the backyard.  The officers did not use threats or coercive tactics to get Cade to open the gate.  No credible evidence exists in the record to indicate that the initial encounter was custodial, or that Cade was not free to end his discussions with the police.  As the evidence indicates, Cade, by his own admission, left one time and went into the house, which clearly indicates that he was free to move about or end contact with the police officers.

When Smalley arrived, he explained to Cade that the officers were investigating a complaint regarding illegal drug activity, and requested Cade's consent to search the house.  After discussing the matter with his mother and attorney, and "thinking it over," Cade consented to the search. Accordingly, the court determines that the "knock and talk" procedure used in this case was a reasonable investigative tactic, and that the officers' initial contact with Cade was consensual and non-coercive.   The court further determines that the "knock and talk" strategy in this case was not a custodial interrogation, did not cause Cade to be detained illegally, and did not violate the Fourth or Fourteenth Amendments.

### 2. Voluntary Consent to Search

Having resolved the "knock and talk" issue, the court now proceeds to determine whether Cade's consent to the first search of his house was voluntary. There are six primary factors for consideration in determining whether consent to a search is knowing and voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*U.S. v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997), *cert denied*, 523 U.S. 1036 (1998). All six factors are relevant; however, no single factor is dispositive or controlling on the issue of voluntariness. *Id*. The question of whether a search was in fact "voluntary" is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S.218, 227 (1973).

The court carefully reviewed all of the facts, evidence and testimony of the witnesses. The determination of the voluntariness of Cade's consent initially appeared to be a close call, but upon review of all the evidence, determination of the credibility of the witnesses, and consideration of the totality of the circumstances, the court determines that all of the factors weigh in favor of finding that Cade's consent for the initial search of the house was knowing and voluntary.

With respect to the first four factors, the evidence shows that Cade was not in custody at the time he consented to the initial walk-through, no coercive tactics were used, he was cooperative, and he was fully aware that he could refuse consent. The officers approached Cade in his backyard. Even if the gate was closed and locked, Cade testified that he voluntarily opened the gate so that the officers could enter. The officers were in their uniforms. The initial encounter was described as

calm and cordial.  Sanderlin initially told Cade that the officers were there because of the dogs.

When Smalley arrived, he explained that the officers were investigating a complaint regarding drugs.

Cade was allowed to move about, and on at least one occasion he went inside the home.  He was also

able to use his cell telephone, and made several calls.  Prior to his arrest, he was not placed in

handcuffs and the officers never drew their weapons or threatened him with weapons.  The court

thus concludes that Cade was not in custody when the officers initially sought consent to search the

house.

When Smalley requested Cade's consent to search the house, Cade was allowed to discuss

this with his mother, and was allowed to call his attorney.  His attorney Mr. Tim Menchu testified

that he spoke with Cade via telephone, although Cade testified that he had no recollection of this

conversation, and advised him to refuse consent.  He also spoke with Wanda Cade and told her to

tell Cade not to consent.  Thus Cade was fully aware that he could refuse consent.  In fact, he

testified that initially he refused to consent to the search, but eventually consented because the

officers said that, if they had to get a search warrant, they would cause damage to the house during

the search.  Cade's testimony regarding damage to his property, however, does not square with what

was taking place at the time.[2]  The officers made a request for the initial walk-through.  At this stage,

the officers did not have probable cause for a search warrant, and acknowledged that probable cause

did not exist.  Had probable cause existed for a search warrant, the officers could have taken steps

to obtain one, and there would have been no need to ask for consent to do a walk-through.  They

---

[2]During the hearing, the court observed the demeanor, candor, credibility and intelligence of the witnesses.  The court determines that the testimony of the officers and sergeant was more credible than that of Cade.  The officers' testimony was more direct and logical.  Even though Cade was personally involved, he could not remember many of the details and had to be prompted by the court.  Frankly, Cade has more to lose in this situation, and a less-than-forthcoming recitation of facts adverse to him would certainly be to his advantage.

**Memorandum Opinion and Order – Page 11**

could have immediately sought a search warrant or written consent from Cade.  Further, if the officers had really coerced Cade to consent to the initial walk-through, they could have proceeded to conduct a thorough search of the house, but did not do so, including a search of closed rooms, drawers, and even the attic, where the drugs were found.  After the initial walk-through was completed, Cade was arrested for being a felon in possession of a firearm.  A search warrant was then obtained based on what the officers observed and smelled regarding illegal drugs inside the house.

Cade implies that he was worn down by the officers' repeated request for consent.  Although one may argue that repeated and persistent requests is evidence of harassment, it is clear from the record that Cade could have continued to refuse consent.  Cade obviously thought "long and hard" before he ultimately consented.  Based on the totality of the circumstances, the only logical conclusion is that Cade voluntarily consented to the walk-through after being fully informed that he could refuse consent.  In fact, Cade vacillated to the extent that Wagner returned to the police car because he concluded that Cade would ultimately refuse consent.

With respect to the fifth factor – defendant's education and intelligence – there is no evidence that Cade's education or intelligence was such that he did not understand what was being requested, or the consequences of his consent.  Cade testified that, although he did not graduate from high school, he did reach the 12th grade.  He also demonstrated to the court that he could read in a manner sufficient to understand the nature of the document he later signed.  Further, Cade was allowed to discuss the issue of consent with his mother and attorney.   He understood the officers' request and the consequences of refusing or consenting to the search.  Cade was also allowed to

determine whom went into the house, and included his mother as one of the participants in the walk-through.  The court thus determines that this factor weighs in favor of finding voluntary consent.

With respect to the sixth factor, Defendant's belief that no incriminating evidence would be found, there is strong evidence that Cade attempted to conceal the narcotics.  The narcotics were found in the attic.  Sanderlin testified that some of the drugs were stuffed in bags and shoe boxes and concealed behind some of the duct work.  He stated that if the officers had just looked in the attic without conducting a search, they  would not have seen the drugs.  This testimony amplifies and validates earlier testimony by the police officers.  Both officers testified that sometime after their arrival at the location, Cade went inside the house.  They stated that when he came back out of the house he was sweating profusely.  Sanderlin testified that during the initial walk-through he noted that the air conditioner was working and that the house was cool.  This testimony was not rebutted by Cade, other than his testimony that he was "sick" on that day, which could account for his sweating.  An attic usually does not have a heating and cooling system, which can make it quite hot or cold depending on the season of the year.  This incident took place in May – one month before the Texas summer was about to strike.  In May 2005, an attic would be hot, and would cause a person to sweat profusely in a few minutes.  In light of the evidence and common sense, a reasonable inference is that Cade placed the drugs in the attic hoping to conceal them from the police officers in the event that a search take place.  Moreover, the officers testified that there were cooking implements indicating that crack had recently been cooked in a container that was placed in the attic with some crack still in it.  The court determines that Cade attempted to conceal the evidence, and agreed to the walk-through because he believed no evidence of illegal drugs would be found, as he

had placed them in the attic – a place where he apparently believed that the officers would not search. Accordingly, this factor weighs in favor of finding voluntary consent.

Considering the totality of the circumstances, the court determines that all six factors weigh in favor of finding that the consent to search the house was knowing and voluntary. The evidence in the record does not support Cade's contention that he was coerced into giving his consent to search his house. Having concluded that the consent for the initial search of the house was voluntary, the court further determines that there was nothing illegal about the walk-through. Accordingly, the motion to suppress based on this contention should be denied.

### B.       Probable Cause for Search Warrant

Cade asserts that the search warrant was unlawfully obtained. He maintains that the evidence gained to form the basis for the search warrant was the result of an earlier unlawful detention and coerced consent. He further contends that the officers' allegation that there was a strong odor of marijuana inside his house is not credible and did not rise to the level of probable cause.

To be valid under the Fourth Amendment, a search warrant must be supported by probable cause. U.S. Const. amend. IV. The court has already determined that Cade voluntarily consented to initial walk-through of the house. His contention that the search warrant was invalid based on this ground, therefore, is unsupported by the record before the court.

Probable cause is determined by using a totality of the circumstances approach. *Illinois v. Gates,* 462 U.S. 213, 230-31 (1983). Based on the totality of the circumstances, the officers' training, and their observations when they conducted the walk-through, the court determines that probable cause existed for the issuance of the search warrant. The Affidavit for Search Warrant was based on Wagner's observations that were relayed to the affiant, Officer Christopher Hight, who

sought the issuance of the warrant.  The affidavit detailed what Wagner and Sanderlin observed when they went into the house with Cade and his mother.  It specifically detailed the strong odor of marijuana, ziplock bags, and the shotgun.  The court determines that the facts articulated in the affidavit are credible, and the affidavit supported probable cause for a search warrant.  The court notes that marijuana has a distinctive and pungent smell, and the officers' testimony that there was a strong smell of marijuana in the bedroom is entirely credible.  Over twelve hundred grams of marijuana were ultimately found in the house.  Further, based on the officers' experience, ziplock bags are used to package and transport marijuana.  Thus all the officers' observations, which included the strong smell of marijuana and the items in the laundry room, were properly used for probable cause for a search warrant, as this evidence was lawfully obtained by the police officers. These facts could be relied upon by the judge issuing the search warrant to make an informed and independent judgment as to whether probable cause existed.  *See id.* at 238-39.  Accordingly, the court determines that the affidavit was sufficient to support a finding of probable cause, and the search warrant was lawfully obtained.

### C.   Voluntariness of Incriminating Statements

Cade contends that any statements he made to the officers after the alleged unlawful detention are fruits of the poisonous tree. "A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir. 1996).  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

The court has already determined that Cade consented to the initial search or walk-through of his house.  Thus, there is no longer an issue of any statement being the fruit of a poisonous tree. The court further determines that Cade's statement after his arrest was voluntary.  It is undisputed that Cade was given his *Miranda* warnings after he was arrested.  Cade testified at the hearing that after he was arrested, an officer told him that any statements he made could be used against him. He further testified that  prior to signing the written statement regarding the drugs found in his house, the same officer read the statement to him, and that he agreed to everything in the statement. He stated that he signed the statement because he was afraid of a possible life sentence,[3] but admitted that everything in the statement was true, except for the time the officers arrived at his house.  There is no evidence that Cade did not understand what he was signing or that he was coerced into signing the statement.  Accordingly, the court determines that, under the totality of the circumstances, Cade's  post-arrest statements were the product of his free and rational choice.  The Government has met its burden, and Cade's motion to suppress statements made after he was arrested should be denied.

---

[3]That an officer informs an arrestee of the sentence he could face, without more, is insufficient to conclude that a statement was not voluntarily made.

> A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will. Such an account may increase the chance that one detained will make a statement. However, as long as the statement results from an informed and intelligent appraisal of the risks involved rather than a coercive atmosphere, the statement may be considered to have been voluntarily made.

*U.S. v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978).  Given the amount of cocaine Cade possessed, he could be sentenced to as much as life in prison under federal or state law.  *See* 21 U.S.C. 841(b)(1)(A); Tex. Health & Safety Code Ann. § 481.112 (Vernon 2003). The officer's statement regarding a possible life sentence, therefore, was correct.  There is no evidence in the record that the officer used any coercive tactics to make Cade sign the statement.  Cade was informed that the statement could be used against him prior to signing the statement.  Thus the signed statement resulted from an informed and intelligent appraisal of the risks involved rather than a coercive atmosphere.

**Memorandum Opinion and Order – Page 16**

**V.**     <u>**Conclusion**</u>

For the reasons stated herein, the court **concludes** that: (1) the "knock and talk" strategy in this case was not a custodial interrogation; (2) the officers' conduct in this case did not violate the Fourth or Fourteenth Amendments to the United States Constitution; (3) Cade voluntarily consented to the initial search (walk-through) of his house; (4) probable cause existed for the issuance of the search warrant and second search; (5)  Cade was warned of his constitutional rights after he was arrested and voluntarily waived those rights when he made statements after he was arrested; (6) any statements given at the police station, oral or written, were voluntary; (7) no coercive police tactics were used during the initial encounter, search, or after Cade was arrested.  Accordingly, the court **denies** the Motion to Suppress.

**It is so ordered** this 13th day of July, 2006.


_Sam A. Lindsay_
Sam A. Lindsay
United States District Judge